FREDERICKA HOMBERG WICKER, Judge.
12John S. Jacobsen Jr., plaintiff, appeals the trial court’s grant of an exception of lack of personal jurisdiction in favor of Norca Corporation, a defendant in this matter. Mr. Jacobsen argues that the trial court erred in granting this exception as the trial court gained personal jurisdiction over Norca because of its brokering sales of asbestos, the product alleged to have caused the damages in this case, and then shipping that asbestos to a plant in Louisiana. For the following reasons we find Mr. Jacobsen’s argument to be without merit and therefore affirm the trial court’s judgment.

FACTS AND PROCEDURAL HISTORY

Mr. Jacobsen filed his original petition for damages in this litigation on May 26, 2010, against Norca and other defendants.
Norca filed exceptions, including its exception of lack of personal jurisdiction at issue here, and an answer to Mr. Jacob-sen’s petition against it on August 9, 2010. Thereafter, the trial court gave Mr. Jacob-sen leave to file different | ^separate supplemental and amended petitions. On May 2, 2012, Norca moved to set a hearing of its exception of lack of personal jurisdiction, and in the alternative for motion for summary judgment against Mr. Jacobsen.[1]
In response, on May 21, 2012, Mr. Ja-cobsen filed his “Opposition To Exception of Lack of Jurisdiction Over The Person And Motion For Summary Judgment Filed By Defendant Norca Corporation.” The record reflects that Mr. Jacobsen’s “exhibits” were attachments to this filing.[2]
On May 29, 2012, the trial court heard Norca’s exception of lack of personal jurisdiction. The record shows that both Mr. Jacobsen and Norca argued various points of law and referenced the attachments to their filings, but that neither party introduced any evidence into the record. During this hearing, Norca objected to the court’s consideration of the various Jacob-sen attachments. The trial court did not rule on this objection.
At the conclusion of this hearing, the trial court judge stated, “I’m going to grant [the] exception.” After the trial court reached this conclusion, it did not hear Norca’s motion for summary judgment. Although no written judgment was issued that day, and the trial court’s statement on the transcript is not definitive, a minute entry from that day reflects that the trial court granted Norca’s exception of lack of personal jurisdiction.
*774 Thereafter, on June 13, 2012, Mr. Jacob-sen moved for, and was granted, a devolu-tive appeal. In his motion for an appeal, Mr. Jacobsen alleges that the trial court sustained Norca’s exception of lack of personal jurisdiction on May 29, 2012. The trial court granted Mr. Jacobsen’s motion for this appeal the same day. In its order granting Mr. Jacobsen’s appeal, the trial court stated that the appeal |4was “from the Judgment rendered in the above-captioned case on May 29, 2012, dismissing defendant Norca Corporation.”
After the trial court granted Mr. Jacob-sen’s appeal however, it entered a written judgment sustaining Norca’s exception of lack of personal jurisdiction. The trial court signed and mailed this written judgment on June 15, 2012.

DISCUSSION

In this appeal, Mr. Jacobsen argues that the trial court erred in granting Norca’s exception of lack of personal jurisdiction. Mr. Jacobsen contends that Norca did in fact have sufficient minimum contacts with Louisiana for the trial court to constitutionally exert in personam jurisdiction over it. Before we address the merits of Mr. Jacobsen’s assignment however, we must determine the preliminary matters of whether this matter is properly before this Court, and whether the record before us sufficiently allows us to reach the merits of the question.

Preliminary Matters

Before addressing the merits of Mr. Ja-cobsen’s appeal, we must determine whether this appeal is properly before this Court, and whether the trial court erred in its judgment when it heard arguments on the exception, where the parties referenced the attachments to their memoran-da, but where the parties introduced no evidence.
As to the first matter, when a trial judge has failed to produce a written and signed final judgment, no appeal from that judgment may be taken. La. C.C.P. art.1911; State v. Beaudoin, 06-88 (La.App. 5 Cir. 6/29/06), 939 So.2d 428, 428-29. A minute entry and an oral judgment, that has not been reduced to writing and signed by the trial judge, are insufficient to divest the trial court of jurisdiction and grant jurisdiction to the appellate court. Beaudoin, supra, (citing La. C.C.P. art. [ s2088). Furthermore, even a written and signed document will not constitute a final judgment if that document indicates that, in the future, a “[j]udgment will be signed.” Spector v. Union City Transfer, 182 So. 524 (La.App. 1 Cir.1938). However, “an appeal granted before the signing of a final judgment is subject to dismissal [only] until the final judgment is signed.” Overmier v. Traylor, 475 So.2d 1094 (La.1985). “[O]nee the final judgment has been signed, any previously existing defect has been cured, and there is no useful purpose in dismissing the otherwise valid appeal.” Id.
Here, the May 29, 2012 trial court’s oral statement that a judgment would be granted, and the minute entry from that date, failed to constitute a final judgment from which the parties could appeal. Because however the trial court corrected its error by signing a written judgment in this matter on June 15, 2012, we will not dismiss this appeal.
We next turn to whether the trial court erred in rendering its judgment in this matter based upon the documents attached by each party to their memoranda but not introduced into evidence. Further, at hearing on the exception, counsel for Norca objected to the court’s consideration of the documents attached to Mr. Jacob-sen’s opposition, stating:
*775 Very briefly. With regard to the documents that [counsel for plaintiffl referenced, I object to them. They are not identified. But curiously on this one which he talked about, and this, who knows where it came from, but it says that they found out the list of these suppliers by — it was developed using the types of products, and companies that provided the types of fibers. They don’t know that. They are just guessing. They went back and did some research according to this, but we object to all of these because we don’t think they are relevant, including the answers to interrogatories, which are unsigned and we don’t know where they came from.
The record reflects that the trial court never ruled on this objection. The record also reflects that no evidence was admitted at this hearing. When a trial court fails |sto rule on an objection before it, that objection is considered overruled. Hutchison v. Seariver Mar., Inc., 09-410 (La.App. 1 Cir. 9/11/2009), 22 So.3d 989, writ denied, 09-2216 (La.12/18/09), 28 So.3d 946. Therefore, by objecting to the trial court’s consideration of Mr. Jacobsen’s attachments, Norca preserved for appeal this issue of whether the trial court’s consideration of Mr. Jacobsen’s attachments was proper. However, Norca did not answer the appeal or assign as error the efficacy of the evidence relied upon by appellant in its opposition to the exception. Therefore, this issue is not before us. Uniform Rules Courts of Appeal, Rule 1-3.
What is still left to be determined however is the question of whether the argument before the trial court on this exception constituted a “hearing” and whether the affidavit relied upon by Norca, as well as the documents attached to Mr. Jacob-sen’s opposition, are properly before this Court for consideration, when they were not introduced into evidence in the trial court.
In this case, the parties each attached documents to their pleadings on the exception of lack of personal jurisdiction, made oral argument based upon those documents to the court, but did not introduce those documents into evidence during oral argument. At the conclusion of oral argument the trial court granted the exception of lack of personal jurisdiction from the bench without oral or written reasons. In de Reyes v. Marine Management and Consulting, Ltd., et al., 90-2214 (La.9/9/91), 586 So.2d 103, 109, the Louisiana Supreme Court set forth two methods of proof relative to exceptions of lack of personal jurisdiction — either with or without a contradictory hearing. If the trial court holds a contradictory hearing before it decides an exception of lack of personal jurisdiction, the plaintiffs burden is “to prove facts in support of [his] showing that jurisdiction was proper by a preponderance of the evidence.”
Rif on the other hand, a trial court does not hold such a contradictory hearing, the court will decide the matter on a record comprised of “pleadings, mem-oranda, and discovery depositions taken” in the matter. Id. at 109. When a contradictory hearing is not held, the burden of the non-moving party, typically the plaintiff, is “relatively slight” and the “allegations of the complaint and all reasonable inferences from the record are to be drawn in favor of the non-moving party.” Id.[3]
*776 We first address a preliminary question: what constitutes a contradictory hearing on an exception of lack of personal jurisdiction? Under the methods of proof set out in de Reyes and its progeny, it appears that even if oral argument on the exception is held, a contradictory hearing is not considered to have taken place unless live testimony is taken. See for example: Dahmes v. Champagne Elevators, Inc., 03-0807, 03-0983 (La.App. 4 Cir. 3/3/04), 869 So.2d 904, 906, writ denied, 04-0844 (La.6/4/04), 876 So.2d 93; and Ruppert v. George Kellett & Sons, Inc., 08-182 (La.App. 5 Cir. 9/30/08), 996 So.2d 501. This seems to be an anomalous rule because it allows parties to argue in open court and to refer to documents which are attached to the exception pleadings without the need to introduce items into evidence, as long as the parties did not introduce live testimony. On the contrary, where on the same exception the parties present live testimony, the documents attached to the exception pleadings seemingly must be introduced into evidence.[4]
Un May 2008, the Louisiana Supreme Court in Denoux v. Vessel Management Services, Inc., 07-2143 (La.5/21/08), 983 So.2d 84, issued a ruling potentially in conflict with de Reyes. In Denoux, the matter before the court was a peremptory exception of prescription. In that case the plaintiffs’ petition made a claim “solely on Louisiana law” for damages and stated facts that they alleged supported their claim. Id. at 86. In response, a defendant filed its prescription exception. Id. The facts that the plaintiffs’ petition alleged stated claims that were “clearly prescribed” under Louisiana law on the face of their petition. Id. at 88. The plaintiffs however opposed the exception with a legal argument that the facts they alleged made a claim under federal maritime law that was not prescribed. Id. at 87. While the plaintiffs relied on certain depositions in making their argument, the plaintiffs never formally introduced these depositions, or anything else, into evidence. Id. at 88.
The Court found that, because their Louisiana law claims were clearly prescribed on the face of their petition, the plaintiffs bore the burden of defeating the exception of prescription. Id. at 88. The court ruled that:
Evidence not properly and officially offered and introduced cannot be considered, even if it is physically placed in the record. Documents attached to memo-randa do not constitute evidence and cannot be considered as such on appeal. Appellate courts are courts of record and may not review evidence that is not in the appellate record, or receive new evidence.
None of the depositions relied on by the Plaintiffs were properly before the trial court at the time of the hearing, nor were they properly part of the record on *777 appeal. Thus, based on the content of the record before us, we must conclude that Plaintiffs failed to meet their burden of proof in this matter.
Id. at 88-89 (internal citations omitted).
The question is whether Denoux applies to the case at bar. While Denoux ruled on the proof required on a peremptory exception of prescription, the case |9before us concerns the proof required on the decli-natory exception of lack of personal jurisdiction. See respectively, La. C.C.P. arts. 927 and 925.
With regard to evidence on trials of these types of exceptions, the Code of Civil Procedure provides similar modes of proof for each. With regard to declinatory exceptions, La. C.C.P. art. 930 states that “[o]n the trial of the declinatory exception, evidence may be introduced to support or controvert any of the objections pleaded, when the grounds thereof do not appear from the petition, the citation, or return thereon.” With regard to evidence on the trials of peremptory exceptions, such as prescription, La. C.C.P. art. 931 likewise says:
On the trial of the peremptory exception pleaded at or prior to the trial of the case, evidence may be introduced to support or controvert any of the objections pleaded, when the grounds thereof do not appear from the petition.
When the peremptory exception is pleaded in the trial court after the trial of the case, but prior to a submission for a decision, the plaintiff may introduce evidence in opposition thereto, but the defendant may introduce no evidence except to rebut that offered by plaintiff. No evidence may be introduced at any time to support or controvert the objeetion that the petition fails to state a cause of action.
It is clear since Denoux, with regard to peremptory exceptions, the evidence must be introduced in order for the court to consider it. It is unclear from Denoux however whether the Louisiana Supreme Court intended to change its de Reyes jurisprudential statement that did not require the burdened party to introduce evidence if the trial court both did not conduct a contradictory hearing and could not determine the merits of the exception from the face of the petition.[5]
However, since Denoux, this Court and others have continued to apply the method of proof announced in de Reyes to exceptions of lack of personal jurisdiction. See Ruppert v. George Kellett & Sons, Inc., 08-182 (La.App. 5 Cir. 9/30/08), 996 So.2d 501 (affirming a grant of exception of lack of personal jurisdiction after considering an attached affidavit, when no evidence was admitted and no contradictory hearing was held); Marchand v. Asbestos Defendants, 10-0476 (La.App. 4 Cir. 11/10/10), 52 So.3d 196, writ denied, 10-2732 (La.2/11/11), 56 So.3d 1002 (finding no personal jurisdiction after trial court: held hearings on exceptions; considered the parties’ memoranda; considered previous cases and motions in those previous cases that were cited in the parties’ memoranda; and, determined that defendant was not bound in the present case by the language it used in a joint motion to dismiss in a previous case. The opinion states that an “affidavit” which has “been submitted in proceedings involving exceptions of lack of personal jurisdiction” is proper for the trial court to consider and distinguishes this circumstance from that of an exception of prescription); Broussard v. Diamond Air *778 craft Industries, Inc., 10-1611 (La.App. 1 Cir. 5/3/11), 65 So.3d 187 (Defendant filed an exception of lack of personal jurisdiction with a supporting affidavit, oral arguments were held, trial court granted exception); Buquoi v. Avondale Industries, Inc., et al., 12-C-0536 (La.App. 4 Cir. 4/24/2012) (unpublished unit) (considered a filed affidavit when no contradictory or evidentiary hearing was held, and ruled that the plaintiff did not meet his burden of proving minimum contacts). In Buquoi the Fourth Circuit specifically found that the de Reyes method of proof was permissible on the trial of an exception of lack of personal jurisdiction. Furthermore, our research reveals no case that specifically speaks to the potential impact of the Supreme Court’s ruling in Denoux upon its prior ruling in de Reyes.
While the de Reyes method of proving up an exception of lack of personal jurisdiction seems to conflict with Denoux, and potentially with the Code of Civil Procedure, unless and until we receive further guidance from the Louisiana ^Supreme Court, we will continue to follow the de Reyes method of proving up an exception of lack of personal jurisdiction. Therefore, in this case it is of no consequence that the parties did not introduce the exhibits upon which they relied in addressing the exception of lack of personal jurisdiction.

On the Merits

Because we found that the documents attached to the parties’ memoranda were properly considered by the trial court, we now address the merits of Mr. Jacobsen’s assignment.

The Law

When reviewing a trial court’s legal ruling on a declinatory exception of lack of personal jurisdiction, an appellate court applies a de novo standard. Walker v. Super 8 Motels, Inc., 04-2206, p. 4 (La.App. 4 Cir. 12/7/05), 921 So.2d 983, 986; Winston v. Millaud, 05-0338, p. 5 (La.App. 4 Cir. 4/12/06), 930 So.2d 144, 149-50 (noting that “jurisdiction itself is a question of law subject to de novo review.”) “However, the trial court’s factual findings underlying the decision are reviewed under the manifest error standard of review.” Maguire Plastic Surgery Ctr., LLC v. Booker, 47,929, 2013 WL 2218004 (La.App. 2 Cir. 5/22/13), 117 So.3d 239 (2013).
A state court’s authority to exercise jurisdiction over a non-resident defendant is governed by the Louisiana Long-Arm Statute, La. R.S. 13:3201.1.[6] 112The *779 limits of the courts’ authority under the Louisiana Long-Arm statute and under constitutional due process are coextensive. Superior Supply Co. v. Associated Pipe and Supply Co., 515 So.2d 790, 792 (La.1987); La. R.S. 13:3201(B)(allowing for Louisiana courts to exercise personal jurisdiction over nonresident defendants “on any basis consistent with the constitution of this state and the Constitution of the United States.”).
The exercise of personal jurisdiction over a non-resident defendant comports with due process when a two-part test is satisfied: first, the defendant must have had certain “minimum contacts” with the forum state; and second, as a result of those contacts, the maintenance of the suit would not offend traditional notions of fair play and substantial justice. Dahmes v. Champagne Elevators, Inc., 869 So.2d at 908 (citing International Shoe Co. v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).
The initial burden of proving sufficient minimal contacts to establish personal jurisdiction rests with the party asserting jurisdiction is proper. de Reyes, 586 So.2d at 107; Swoboda v. Hero Decks, 09-1303, p. 2 (La.App. 4 Cir. 3/31/10), 36 So.3d 994, 997 (holding that the party seeking to invoke personal jurisdiction bears the burden of establishing such jurisdiction exists). Once sufficient minimum contacts have been established, a presumption of reasonableness of jurisdiction arises, de Reyes, supra. “The burden then shifts to the opposing party to prove the assertion of jurisdiction would be so unreasonable in light of 1 ^traditional notions of fair play and substantial justice as to overcome the presumption of reasonableness created by the defendant’s minimum contacts with the forum.” Id.
As to the first test of “minimum contacts”, “[ojpinions in the wake of the path-marking International Shoe decision have differentiated between general or all-purpose jurisdiction, and specific or case-linked jurisdiction.” Goodyear Dunlop Tires Operations, S.A. v. Brown, - U.S. -, -, 131 S.Ct. 2846, 2851, 180 L.Ed.2d 796 (2011) (citing Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414, nn. 8-9, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)). Explaining the difference, the Supreme Court stated:
A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so “continuous and systematic” as to render them essentially at home in the forum State. Specific jurisdiction, on the other hand, depends on an “affiliatio[n] between the forum and the underlying controversy,” principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State’s regulation. In contrast to general, all purpose jurisdiction, specific jurisdiction is confined to adjudication of “issues deriving from, or connected with, the very controversy that establishes jurisdiction.”
Goodyear, supra (internal citations omitted). Here, Mr. Jacobsen does not contend that Norca’s contacts with Louisiana subject it to the general jurisdiction of *780 Louisiana courts. Rather, he argues that, under the stream of commerce theory, Norca’s actions, which resulted in his injury, allow the Louisiana courts to exert specific jurisdiction over it.
The Fourth Circuit explained in Broussard v. Diamond Aircraft Industries, Inc., supra:
The minimum contacts prong of the two-part due process test is satisfied by a single act or actions by which the defendant “purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws.” A & L Energy, Inc. v. Pegasus Group, 00-3255, p. 5 (La. 6/29/01), 791 So.2d 1266, 1271, cert. denied, 534 U.S. 1022, 122 S.Ct. 550, 151 L.Ed.2d 426 (2001) (citations omitted). However, this purposeful availment must be such that the defendant “should reasonably anticipate being haled into court in the forum state.” Id. The rationale behind the “purposeful availment” requirement is to ensure that the nonresident defendant will not be haled into a jurisdiction solely as a result of a random, fortuitous, or attenuated contact, or by the unilateral activity of another party or a third person. Id. Put another way, the requirement of minimum contacts can be seen to perform two related, but distinguishable, functions: “[it] protects the defendant against the burdens of litigating in a distant or inconvenient forum. And it acts to ensure that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system.” World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (U.S.1980).
The Supreme Court has determined that the stream of commerce theory is a specific jurisdiction concept. Specifically, the Supreme Court stated that the “[f]low of a manufacturer’s products into the forum ... may bolster an affiliation germane to specific jurisdiction.” Id. The U.S. Supreme Court originally articulated the stream of commerce theory of specific jurisdiction in World-Wide Volkswagen, supra. “In essence, the “stream of commerce” theory holds that a defendant’s placing of its product into the stream of commerce with the knowledge that the product will be used in the forum state is enough to constitute minimum contacts.” Hunt v. Schult Homes Corp., 94-1592 (La.App. 3 Cir. 5/3/95), 657 So.2d 124, 126. Since its inception, the stream of commerce theory has been divided into what has been coined as the “stream of commerce” and the “stream of commerce plus” theory.
In Asahi Metal Industry Co. v. Superior Court of California, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), the U.S. Supreme Court issued a plurality opinion in which the concurring justices did not subscribe to the portion of the opinion which sought to require more purposeful activity directed at the forum state than the mere placing of a product into the stream of commerce. This [^established the “stream of commerce plus” theory; it requires additional conduct by the defendant which is purposefully directed toward the forum state. Since Asahi, several Louisiana courts, in defective product cases, have adopted the “stream of commerce plus” theory. For example, see: Langley v. Oxford Chemicals, Inc., 25,596 (La.App. 2 Cir.1994), 634 So.2d 950; Cadawas v. Skibsaksjeselskapet Storli, Bergen, 630 So.2d 289 (La.App. 5 Cir.1993); J. Wilton Jones Co. v. Touche Ross & Co., 556 So.2d 67 (La.App. 4 Cir.1989).
In J. McIntyre Machinery, Ltd. v. Nicastro, - U.S. -, 131 S.Ct. 2780, 180 L.Ed.2d 765 (2011), the U.S. Supreme *781 Court revisited the law of personal jurisdiction and the stream of commerce theory. In McIntyre, the plaintiff injured his hand in New Jersey while using a machine manufactured by the defendant. The machine had been manufactured in England, where the defendant was incorporated and operated. The machine was then sold to a U.S. distributor, which in turn sold and shipped the machine to New Jersey. The defendant did not market, sell, or ship machines to New Jersey, and the U.S. distributor had only sold one of the defendant’s machines in New Jersey— the machine that injured the plaintiff. The plaintiff sued the defendant, and the New Jersey Supreme Court held personal jurisdiction was proper.
The U.S. Supreme Court thereafter reversed the decision of the New Jersey Supreme Court, but it did not produce a majority opinion. Justice Kennedy authored a plurality opinion, joined by Chief Justice Roberts, Justice Scalia, and Justice Thomas. Under the plurality’s approach to personal jurisdiction, “[t]he defendant’s transmission of goods permits the exercise of jurisdiction only where the defendant can be said to have targeted the forum; as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum State.” McIntyre, 131 S.Ct. at 2788.
|1fiWhere, as in McIntyre, the reasoning of a Supreme Court opinion that does not command a majority vote, the opinion is not binding precedent. CTS Corp. v. Dynamics Corp. of Am., 481 U.S. 69, 81, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987). Instead, “[w]hen a fragmented Court decides a ease and no single rationale explaining the result enjoys the assent of five Justices, ‘the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.’ ” Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (quoting Gregg v. Georgia, 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ)). In McIntyre, Justice Breyer’s concurring opinion, joined by Justice Alito, furnished the narrowest grounds for the decision and controls here.
Justice Breyer made clear that his view that “resolving [the] case require[d] no more than adhering to [the Supreme Court’s] precedents” and that his decision was “based on the facts,” which involved only a single sale in New Jersey. McIntyre, 131 S.Ct. at 2791-92 (Breyer, J., concurring). He explained that under any of the Court’s precedents “a single isolated sale” is not an adequate basis for personal jurisdiction. Id. at 2792. The crux of Justice Breyer’s concurrence was that the Supreme Court’s framework applying the stream-of-commerce theory — including the conflicting articulations of that theory in Asahi — had not changed, and that the defendant’s activities in McIntyre failed to establish personal jurisdiction under any articulation of that theory. Id.; See AFTG-TG, LLC v. Nuvoton Tech. Corp., 689 F.3d 1358, 1363 (Fed.Cir.2012). Therefore, the narrowest holding is that which can be distilled from Justice Breyer’s concurrence is that the law remains the same after McIntyre.
Recently, in Ainsworth v. Moffett Eng’g, Ltd., 12-60155, 2013 WL 1920729 (5th Cir. May 9, 2013), the U.S. Fifth Circuit agreed that McIntyre did not change |17to law and distinguished it from the circumstance before it. The court acknowledged that its use of the “stream-of-commerce” theory did not require that the defendant target the forum and it was therefore in tension with McIntyre’s plurality opinion. The Court however reasoned that, since only the narrowest holding from McIntyre con *782 trolled, it was free to continue to continue its use of the “stream-of-commerce” theory.
At this point, it is not clear whether the Louisiana Supreme Court, in determining whether a defendant had minimum contacts with our state, would use the “stream of commerce” or “stream of commerce plus” theory analysis. However, given that the legislature intended to provide the broadest possible grounds for jurisdiction in its enactment of La. R.S. 13:3201(B), we will apply the “stream of commerce” analysis.[7]

The Facts

Turning to the facts of this matter, we find that Norca attached to its Memorandum in Support of Exception and Motion for Summary Judgment, the affidavit of Norca president, Russell Stern. In that affidavit Mr, Stern stated:
• He is the son of Harry Stern, Norca vice president from 1951 to 1964 and its president from 1964 to 1983.
• Norca is a New York corporation with its principal place of business in the state of New York as it has been since its inception in 1946.
• Norca’s principal business has been as a broker of industrial commodities.
• During the 1950’s Norca’s principal business was as a sales agent for American companies involved in importing and exporting steel and machinery equipment.
11S* As a sales agent, Norca’s role was to locate potential buyers for commodities.
• Norca has never maintained any office, telephone listing, post office box, mailing address, or bank account in the State of Louisiana.
• Norca has never owned, leased, nor possessed any interest whatsoever in any assets in Louisiana, including real property.
• At no time for at least the last twenty years has Norca ever employed anyone or had agents based or residing in Louisiana.
• At no time for at least the last twenty years was Norca a party to a contract in Louisiana, or entered into a contract, the terms of which required performance in whole or in part in Louisiana or the application of Louisiana law.
• For at least the last twenty years Nor-ca was not involved with the sale of any products in or transported to Louisiana, nor did it derive any revenue from the sale of goods or services or any other activity in Louisiana.
• At no time for at least the last twenty years was Norca engaged in any advertising directed to or otherwise calculated to reach Louisiana.
• Norca’s business has never involved the mining, manufacturing, or processing of asbestos or asbestos containing products.
• Norca’s business has never designed, tested, evaluated, packaged asbestos or asbestos containing products.
• From 1954 to 1958, Norca acted as a disclosed commissioned agent in the transaction of raw asbestos mined in Africa.
• In its sole capacity as a disclosed commissioned agent, Norca never took title to, or possession of any asbestos and asbestos was never delivered to, stored, located or otherwise transmitted to Norca’s New York premises.
• In 1954, John Beith (S.A.) Pty. Ltd., a South African corporation in Durban, *783 South Africa contacted Harry Stern, Imthen vice president of Norca, requesting that Norca locate companies in the United States interested in buying Beith asbestos. Beith was a distributor and exporter of raw material, which represented African producers of such materials and represented owners of several asbestos mines in Africa.
• Norca contacted Johns-Manville Corporation, which stated that it would purchase Beith asbestos.
• Johns-Manville took title to and possession of asbestos directly from Beith either in Mozambique or South Africa.
• All transactions of asbestos from Beith to Johns-Manville occurred during the period from 1954 to 1958 and Norca was paid as a disclosed commission agent for these transactions. In 1958, that relationship was terminated and Norca no longer served as a disclosed agent for the sale of asbestos material to Johns-Manville.
• Beith directly passed title to, and possession of, all asbestos it sold to Johns-Manville in either Mozambique or South Africa. Norca Corporation never assumed any risk of loss for the asbestos in question;
• None of the asbestos material purchased by Johns-Manville from Beith contained any label or packaging with Norca’s name on it or any other company markings that would have suggested that Norca held the asbestos material in question out as its own product.
• Norca Corporation never shipped, marketed, or otherwise distributed any asbestos materials to the State of Louisiana.
• Norca did not exercise any right of control over the marketing, distribution, or shipping of the asbestos material purchased by Johns-Manville.
• During the 1950’s, Norca had no knowledge that Johns-Manville owned or operated any Louisiana plants that used asbestos.
• Norca had reason to believe that any such asbestos purchased by Johns-Manville was shipped directly to the East coast of the | ^United States.
• Since it is normally more economical to ship commodities from overseas locations by sea directly to the port nearest their final destinations, rather than to ship them by sea to distant ports, then by rail/truck to their final destinations, Norca had no reason to believe that Johns-Manville would ever send any of the asbestos obtained from Beith to Louisiana.
Mr. Jacobsen attached to his opposition to the exception of lack of personal jurisdiction various documents from the Asbestos Claims Research Facility, a document and records repository which contains, among other things, Johns-Manville business records relevant to asbestos cases, Mr. Jacobsen attached the following:
• Johns-Manville discovery responses in an unrelated case in which Johns-Manville stated that it used asbestos fiber from a number of sources, including crocidolite and amosite fibers imported into this country from South Africa and that the suppliers included Norca Corporation.
• Foreign Asbestos Fibre Shipments reports attached to those discovery responses which indicate that in 1956 Norca Corporation shipped Blue NC-300 asbestos fibers to Johns-Manville. The shipping point was Lorenco Marques and 2402.69 tons of fiber was shipped. In 1957 Norca Corporation shipped 1523 tons of Blue NC-300 to Johns-Manville. The shipping point *784 was Lourenco Marque. In 1958 Norca Corporation made two shipments to Johns-Manville. The shipments totaled 1981 tons and were shipped F.O.B. shipping point. In 1959 Norca shipped 402 tons of NC-20 Blue to Johns-Manville F.O.B. shipping point.
• An Asbestos Fiber Vendors exhibit listed both Beith, John (S.A.) Pty. Ltd., Durban, So. Africa and Norca Corporation, Great Neck, New York as vendors.
• A May 9,1956 letter from M.O. Miche-lowski, Division Headquarters regarding “Control Laboratory Asbestos Reports” directed to a number of people including A. Jaeobs-Manville, E. Bo-net-Manville, A. Docco-Manville, I.I. Prauth-Marrero. The letter listed
12i A. vendors
[[Image here]]
3. NC-300 Blue Fibre-Norca Corporation”
[[Image here]]
B. General Purchase Department Orders — 1956
[[Image here]]
3. NC-300 Blue Fibre-GPD 19077
[[Image here]]
The letter further advised,
We will continue to advise on each fibre shipment the following:
1. Type of fibre
2. Quantity
3. Vessel on which shipment made. We will, also, indicate the approxi-mant arrival date of vessel in the port.
Mr. Jacobsen also attached a January 27, 1981 “Memo to File” from “L. Berry” which states,
Pat Fennel prepared the attached lists of companies that provided asbestos fiber to the Marrero, La. plant during the '40’s, '50’s & '60’s. The information was developed by using the types of products produced, the type of asbestos fiber contained in the products, and the companies that provided those types of fiber to J-M.
Attached to the memo regarding “Marrero Plant 1940’s & 1950’s” which lists,
Blue: John Beith (S.A.) Pty., Ltd
British Metal Corporation
Colonial Sugar Refining Co.
Antony Gibbs & col, Ltd
Norca Corporation
Mr. Jacobsen also attached two depositions, of Harry and Russell Stern. In his July 11, 1994 deposition in an unrelated case Harry Stern stated that he began working for Norca in 1946. Eventually he became the sole stockholder of the company, its president, then chairman of the board and continued as emeritus chairman. The company was originally located in New York, New York, in the |22Empire State Building, later moving to Great Neck, New York. The company was always a New York Corporation with its’ principal place of business in New York. In the early 1950’s he worked as a broker, selling, finding commodity sources, suppliers and customers. In 1958 he became vice president and, in 1964, president. In 1994 he became chairman of the board. From about 1954 to 1958 Norca represented John Beith Co., South African asbestos sellers, in the sale of asbestos fiber to U.S. companies, including Johns-Manville. Harry Stern made the contact with a representative of Beith in South Africa. Beith asked him to contact Johns-Manville as it was a pipe manufacturer and Beith could supply Transvaal Blue asbestos for use in the manufacture of pipe. Transvaal Blue was the only type of asbestos fiber Harry Stern brokered to U.S. companies. He met with the Johns-Manville people in *785 New York and supplied them with fiber samples to test. Under his handshake agreement with Beith they paid him a commission of five percent of each sale. He never discussed with Johns-Manville where they manufactured the pipe. He also never discussed with Beith or Johns-Manville the transport of the fiber from South Africa to the U.S. Johns-Manville called him when they needed a shipment and Beith called him when they had product to ship. When Beith contacted him he called Johns-Manville with the offer of product. Johns-Manville would thereafter issue a purchase order issuing the shipping instructions which were F.O.B. shipping point with shipment to the port of New York. Beith delivered the product to the dock at Mozambique or Durban where it was shipped to New York. Johns-Man-ville took ownership at the South African port. Norca never took ownership of product. Norca did not hire the shipping line and Johns-Manville always used Lykes shipping and shipped from South Africa to New York. Beith sent cables to Norca to advise the customer that a shipment had been made and the estimated time of arrival. He never recalls a Johns-Manville [ ^shipment being delivered anywhere but the port of New York. He never spoke to anyone at Johns-Manville about where they used the South African fiber. The asbestos sales generated approximately two percent of Norca’s gross income for the involved years. Johns-Manville paid Beith for the shipments with a letter of credit going to Beith. Norca was paid by Beith or by Beith’s bank via Beith’s instructions. Norca never purchased fiber in South Africa and resold it in the U.S. Norca was at all times a broker between the seller and the buyer.
Mr. Jacobsen’s second attached deposition was of Russell Stern. This deposition was taken in May, 2009, in an unrelated case. In it, Russell Stern stated, he had joined Norca in 1971 and was, at the time of his May 9, 2009 deposition, the president of the corporation. He knew that the company acquired asbestos from South Africa in the mid 1950’s and provided it to Johns-Manville. There are no documents available regarding these transactions as they occurred over fifty years ago. The company provided asbestos to Johns-Man-ville but was only the broker. He understood that Beith was an amalgamation of small independent miners that did not have a direct relationship with Johns-Man-ville. Johns-Manville took ownership of the asbestos in Africa, and he has no idea where they shipped it. John Beith paid Norca a commission for its work. As to the name “NC-300,” he knows nothing about that. He knows nothing about Nor-ca branding asbestos products. He acknowledged his answer to interrogatories in which he stated,
The Norca Corporation did not manufacture, distribute, sell or supply or use asbestos containing products. The Nor-ca Corporation for a brief period of time in the 1950’s, approximately 1954 through 1958, acted as a disclosed commission agent in the transaction of small amounts of asbestos in Africa. The Norco Corporation never took title to or possession of asbestos. No asbestos was ever distributed, held or sold in Norco’s premises in New York. With respect to any exposure | ^site that is the subject matter of this litigation, the response is the same. Norca Corporation has no documents nor information regarding the exposure site.

Analysis

At the outset, we find that the evidence does not establish that the trial court had jurisdiction over Norca because of consent or under a theory of general jurisdiction. Rather, the issue here is *786 whether the facts establish that Norca has sufficient minimum contacts with Louisiana to make the exercise of specific in personam jurisdiction over it proper. Applying the law to these facts, we find that Norca did not have such sufficient minimum contacts with Louisiana under either the “stream of commerce” or “stream of commerce plus” theory of specific personal jurisdiction.
First, we find that the evidence does not establish that Norca participated in the transfer of the asbestos in question into the State of Louisiana. Ownership of the asbestos transferred from Beith to Johns-Manville at the African port. There is no evidence that Norca ever owned the asbestos fiber. Further, Norca did not direct the asbestos to any particular geographic location, or state of the United States. Although Norca brokered the transfer of asbestos from Beith to Johns-Manville, Norca never determined or even influenced where Johns-Manville would take that asbestos. That decision was made by Johns-Manville directly.
Norca’s asbestos related transactions here were with Johns-Manville in New York. While Norca may have obtained the benefits and protections of New York law when making these transactions, there is no evidence that Norca obtained or sought such a benefit from Louisiana. Norca had no property or office in Louisiana, nor did it advertise in, or send any employees to the State. Norca’s only relevant contact with Louisiana was that the asbestos it brokered or supplied ended up here. There is no evidence that Norca knew that the asbestos might be shipped |2sto Louisiana after Johns-Manville received it from Africa. On these facts, we find that the evidence does not establish that Norca ever purposefully availed itself of the benefits and protections of Louisiana’s law.
Second, even if Norca was a supplier of this asbestos who placed it into the stream of commerce, there is no evidence that Norca could ever reasonably anticipate that its products would find their way to Louisiana. The evidence on this issue in fact indicates that Norca had reason to believe that the asbestos would be shipped to New York, or other sea ports on the East coast of the United States. Additionally, in World-Wide Volkswagen, Asahi, and McIntyre, the defendant seeking to avoid the court’s jurisdiction at one point owned the product and thereafter sold it into the stream of commerce. That is not the case here. While it may be true that but-for Norca, the particular asbestos fibers which are alleged to have caused Mr. Jacobsen’s injury may never have reach Louisiana, this is an insufficient basis by which to allow Louisiana courts to exert in personam jurisdiction over Norca.

CONCLUSION

For the foregoing reasons, we hereby affirm the trial court’s grant of Norca’s exception of lack of personal jurisdiction.

AFFIRMED

. Norca filed a memorandum in support of this motion which contained legal argument and reference to facts contained in Russell Stern's affidavit attached to the memorandum. At no point did Norca seek to introduce the affidavit into the record.

. Mr. Jacobsen did not seek to introduce these attachments into the record.

. The Federal Rules of Civil Procedure provide a similar method of proof for a plaintiff seeking to establish a defendant has minimum contacts. MCR Mktg., L.L.C. v. Regency Worldwide Servs., L.L.C., CIV. 08-1137, 2009 WL 728523 (W.D.La. Mar. 18, 2009) (“Under Rule 12(b)(2), the ‘plaintiff bears the burden of establishing a district court’s jurisdiction over a non-resident, but it need only make a prima facie case if the district court rules *776 without an evidentiary hearing.’ Johnston v. Multidata Sys. Intern. Corp., 523 F.3d 602, 609 (5th Cir.2008). '[Ujncontroverted allegations in the plaintiff’s complaint must be taken as true, and conflicts between the facts contained in the parties’ affidavits must be resolved in the plaintiff's favor for purposes of determining whether a prima facie case for personal jurisdiction exists.' Id.”)

. Further, in de Reyes, the Court stated that when a contradictory hearing is not held on an exception of lack of personal jurisdiction, the matter will be decided on, "pleadings, memoranda, and discovery depositions taken.” If a party attaches an item that does not fall into one of those categories, an ambiguity exists as to whether the court can consider that item if it is not introduced. Further, does reliance upon such an attachment in oral argument mean that a contradictory hearing has taken place, and that evidence was required to be introduced?

. Compare Dupre Logistics LLC v. Bridges, 10-1071, 2010 WL 5479723 (La.App. 1 Cir. 12/22/10), finding the trial court erred when it granted an exception of lack of subject matter jurisdiction with no evidence introduced on the record.

. The Louisiana Long-Arm Statute, La. R.S. 13:3201, provides:
A. A court may exercise personal jurisdiction over a nonresident, who acts directly or by an agent, as to a cause of action arising from any one of the following activities performed by the nonresident:
(1) Transacting any business in this state.
(2) Contracting to supply services or things in this state.
(3) Causing injury or damage by an offense or quasi offense committed through an act or omission in this state.
(4) Causing injury or damage in this state by an offense or quasi offense committed through an act or omission outside of this state if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives revenue from goods used or consumed or services rendered in this state.
(5) Having an interest in, using or possessing a real right on immovable property in this state.
(6) Non-support of a child, parent, or spouse or a former spouse domiciled in this state to whom an obligation of support is owed and with whom the nonresident formerly resided in this state.
(7) Parentage and support of a child who was conceived by the nonresident while he resided in or was in this state.
(8) Manufacturing of a product or component thereof which caused damage or injury in this state, if at the time of placing the product into the stream of commerce, the manufacturer could have foreseen, realized, *779 expected, or anticipated that the product may eventually be found in this state by reason of its nature and the manufacturer’s marketing practices.
B. In addition to the provisions of Subsection A, a court of this state may exercise personal jurisdiction over a nonresident on any basis consistent with the constitution of this state and of the Constitution of the United States.

. However, in this case, the result would remain the same under either of the applicable "stream of commerce” or "stream of commerce plus” theories.